## Watson's Estate

*Virgil L. Johnson* and *Thomas J. Watson*, for exceptants.

*C. E. Brockway*, for Commonwealth.

MCLAUGHRY, P. J., April 19, 1935. — Harry Watson died on July 16, 1919, testate, and in his last will and testament left all of his property to his two sons, Samuel J. Watson and Thomas Watson. Harry L. Keck, Esq., was

appointed inheritance tax appraiser, and he certified that he appraised the estate as of December 23, 1920, qualified as to his appraisement on January 3, 1921, and filed the same in the register of wills' office. The appraisement shows that he appraised as part of the estate the sum of $4,230.50, money advanced to Samuel J. Watson to pay premiums on life insurance policies, and also notes of Samuel J. Watson to Harry Watson, containing the following amounts: $8,299, $95.64, $15,111.13, $105.95 and $92.92. There were also notes amounting to $7,200, upon which Harry Watson was accommodation endorser, making a total of $35,135.14 which Samuel J. Watson was owing to his father, or to his father's estate. The sum of $27,935.14 was owing directly to Harry Watson at the time of his death, and $7,200 came into existence by reason of the accommodation endorsement of Harry Watson, and afterwards paid by the estate. Harry Watson was also the owner of certain real estate, situated in the borough of Greenville, at the time of his death. The appraiser found the assets at a value of $72,091.87, after deducting decedent's debts and administration expenses.

The exceptants allege that there are three items which should be excluded from the net value of the estate:

1. A contingent liability of $15,000 upon the stock owned by the decedent in the Northern State Bank of Gary, Indiana. In August, 1918, the Northern State Bank of Gary, Indiana, closed its doors. Harry Watson was at that time the owner of $15,000 par value of its stock, and Samuel J. Watson was the president of said bank. The International Trust & Savings Bank of Gary, Indiana, agreed to take over the assets of the Northern State Bank and pay its depositors, and it was agreed that Harry Watson would give his note for $15,000, and Thomas Watson would give his note for $45,000. These notes were to be held by the International Trust & Savings Bank to cover any shortage in the liquidation of the assets of the Northern State Bank. The International

Bank in liquidating the assets of the Northern State Bank was unable to realize sufficient to pay the depositors and it became necessary for the note of Harry Watson for $15,000 to be paid, and it would seem that the amount was paid by two checks of Harry Watson, one for $5,000, and the other for $10,000. The exceptants claim that this $15,000 was a debt of Harry Watson's, and should be deducted from the gross value of the estate in determining the amount subject to tax.

The $15,000 note had not been paid at the time the inheritance tax appraiser filed his report, the first payment being made on January 28, 1921, and the final payment on May 16, 1921. The inheritance tax appraiser computed the value of the estate upon two assumptions: (1) That the estate would not be called upon to pay the $15,-000 liability; (2) that the estate would be called upon to pay the $15,000 liability.

It would seem from the arguments of counsel and the briefs filed that there is a dispute as to the meaning of the word "debt" as used in the Act of June 20, 1919, P. L. 521, the Commonwealth contending that the word relates only to the obligations of the decedent to pay a fixed and certain sum of money, and cannot be extended to embrace contingent liabilities or unliquidated claims. The exceptants contend that the word "debt" is not to be so interpreted, but has such a meaning that would cover the amount paid by the estate of Harry Watson after the appraisement was made. Section 2 of the Act of 1919, supra, reads as follows:

"In ascertaining the clear value of such estates, the only deductions to be allowed from the gross values of such estates shall be the debts of the decedent. . . ."

The question to be determined here is whether a contingent liability is a debt such as may be deducted. There are a great many definitions of the term "debt", and many of these have been cited by the counsel in their briefs. In 17 C. J. 1371, we find the following:

"Judicial definitions of the term 'debt' are numerous. . . . It has not, however, a fixed or invariable signification, but has several recognized meanings, which vary greatly, according to the subject matter and the language in connection with which the word is used. It is used in different statutes and constitutions in senses varying from a very restricted to a very general one."

On page 1372, we find the following statement:

"In a purely technical sense, it is that for which an action of debt or indebitatus assumpsit will lie; a sum of money due by certain and express agreement, as by a bond for a determinate sum, a bill or note, a special bargain, or a rent reserved on a lease, where the quantity is fixed and specified, and does not depend upon any subsequent valuation to settle it."

We are of the opinion, from the law applicable to the settlement of estates, that it is intended that all contingent liabilities must be adjusted before an estate is settled. Unliquidated claims must be liquidated, and disputes must be adjudicated. It would also appear that if there is any doubt as to the interpretation of a tax statute, the doubt is to be resolved in favor of the taxable, and not in favor of the Commonwealth. Pertaining to the Act of 1919, the Supreme Court in the case of Barber's Estate, 304 Pa. 235, 240, said:

"As the Commonwealth is seeking to impose a tax on the property, the burden is on it to show that it clearly came within the tax statute. If there is doubt or uncertainty as to the imposition of the tax, that doubt or uncertainty should be resolved in favor of the taxable."

Section 2 of the Act of 1919, provides that the inheritance tax is to be imposed upon the "clear value" of the property passing to the beneficiaries. It is evident in this case that the estate has had to pay this obligation of $15,000, and this means a reduction of the amount to the beneficiaries. To refuse to regard such a payment by the estate as a debt of the estate and to permit said amount to be subject to inheritance tax would not be im-

posing a tax upon the "clear value" of the estate. We think it is intended by the law that all debts or liabilities of the decedent must be eliminated before there is a "clear value" available for distribution. We believe the $15,000 paid by the estate as an obligation of Harry Watson during his lifetime should be deducted, as suggested by the inheritance tax appraiser in case the estate would be called upon to pay the note given to the International Trust & Savings Bank of Gary, Indiana.

2. The exceptants contend that the house and lot in Greenville valued at $10,288.94 was not an asset of decedent at the time of his death, and therefore should be excluded from the appraisal of the estate.

At the hearing held in this case the exceptants offered in evidence an original deed from Harry Watson and Samuel J. Watson to Thomas Watson, dated July 12, 1919, and acknowledged upon that date.

It would seem from the evidence presented that the Greenville property originally belonged to Annie M. Watson, wife of Harry Watson and mother of Samuel J. Watson and Thomas Watson, and was bequeathed by her to her husband, Harry Watson, during his natural life, and at his death to the two sons, and that at some time during the year 1918, Harry Watson suggested to his sons that for sentimental reasons he would like to have the home in his own name, and suggested that if they would permit him to hold the title in trust for them, he would not encumber the same and would at any time convey to them the life interest upon request. The two sons complied with the request of their father, and a deed was made dated May 16, 1918. On July 4, 1919, Harry Watson and S. J. Watson conveyed the said Greenville property to Thomas Watson by deed, but the deed was never recorded but was delivered to the said Thomas Watson, and was in his possession at the time of the death of his father. At the hearing it was proven that this deed had been lost after it had been received as evidence in the case now before the court, and further evidence was presented

giving proof of the contents of the deed. This deed contained the following:

"Whereas Annie M. Watson, of Greenville, Pennsylvania, died upon the 16th day of August, 1916, leaving as parties hereto to survive her as her only heirs at law, and whereas in a divisions of the estate of Annie M. Watson, Thomas Watson took the real estate of said decedent situate in Allegheny and Blair counties, Pennsylvania, and made payment to the other parties hereto for the difference by which the aggregated value of said real estate exceeded the share, or proportion, of said Thomas Watson in the estate of said Annie M. Watson; and whereas S. J. Watson and Thomas Watson conveyed to Harry Watson in trust the estates in remainder devised to them by the said Annie M. Watson in her real estate in Greenville, Mercer County, Pennsylvania, now therefore this indenture witnesseth."

The deed then continues to convey the Greenville property to Thomas Watson.

Does this deed possess all the requisites and essentials of a valid deed? If so, the Greenville property did not belong to Harry Watson at the time of his death. In 18 C. J. 157, we find that the requisites or essentials of a deed are:

(1) Competent or proper parties, (2) a proper subject matter, (3) in at least some classes of deeds a valid consideration, (4) a written or printed form, (5) sufficient and legal words, (6) reading if desired before the execution, (7) execution, signing, sealing, attestation, and (8) delivery.

Objection is made to the genuineness of the deed, as it was without consideration. Thomas Watson, concerning this, testified as follows:

Q. "Did you pay any money for it?

A. "No, I didn't pay any cash or any money, or give any check, or anything.

Q. "What was the real consideration for the deed?

A. "The deed was based in part upon my interest in

my mother's estate and in part was an execution of my father for the trust subject to which I had deeded to him my interest in the Greenville property, and the same trust in which my brother had deeded to my father his interest in the Greenville property. As between my brother and myself, the consideration was in part the guarantee which I had given in connection with the Northern State Bank matters at Gary, Indiana."

It is alleged on the part of the Commonwealth that inasmuch as Harry Watson was ill and in a hospital when the deed was executed, the exceptants have failed to prove that he was mentally competent to execute a deed at that time. We think the exceptants are not required to present testimony of this nature, but that the burden is upon the Commonwealth. It is always presumed that the grantor in a deed is competent to execute it at the time of its execution, and the person alleging incompetency must assume the burden of proving the same. We have, however, the testimony of the exceptants as to the mental condition of Harry Watson. Thomas Watson testified as follows:

"The deed was prepared by me in my office in Pittsburgh, and I took it to the Allegheny General Hospital on July 12, 1919, and my brother was there with me, and my father was there, and I told him what the property was and we discussed it, and he said that was all right and that was what he wanted to do, including the matter about the Greenville house. Father's mind was very clear."

We are of the opinion that this objection to the validity of the deed is without merit. We have examined all of the contentions of the counsel for the Commonwealth as to the validity of the deed, as set forth in the brief presented, but we reach the conclusion that they are without merit, and that Harry Watson during his lifetime conveyed the Greenville property to his son Thomas Watson, and it was therefore not an asset of Harry Watson at the time of his death.

3. The indebtedness of S. J. Watson to the decedent aggregated $35,135.41. The inheritance tax appraiser found that S. J. Watson was insolvent at the date of decedent's death. The following statement appears in the appraiser's report:

"The executor claims S. J. Watson has no property from which his indebtedness to the estate can be collected, and after investigation I believe this to be correct."

The testimony taken August 1, 1921, shows that S. J. Watson testified as follows:

Q. "Outside of any assets which you may have received from the estate of Harry Watson, did you have outside or independent means from which you could pay these debts?

A. "I did not."

Q. "Did you have any independent assets outside of the estate of Harry Watson from which you could pay these debts?

A. "I did not."

Again in the testimony taken January 3, 1933, he testified as follows:

Q. "What assets did you have after your father's death with which to pay these notes?

A. "None."

From testimony taken it appears that S. J. Watson was insolvent; that is, his notes were uncollectible, and they had no value whatsoever at the time of decedent's death.

The appraiser treated S. J. Watson as a distributee of the estate, holding that his notes were good and collectible to the amount to which he was indebted to the distribution of the estate, namely, one half of the estate. To the extent the notes of S. J. Watson exceeded his distribution of the estate, the appraiser treated said notes as worthless. The exceptants contend that this action of the appraiser was erroneous. We are of the opinion that this should not have been done, reaching this conclusion

from a reading of the Act of 1919, and from the law as laid down in Frick's Estate, 277 Pa. 242.

At the time of the hearing objection was made to the testimony of S. J. Watson and Thomas Watson, for the reason that they were incompetent witnesses under the Act of May 23, 1887, P. L. 158. The Commonwealth contends that the statute makes both S. J. Watson and Thomas Watson incompetent witnesses to any matters occurring before the death of the decedent. We have given considerable time to ascertain the law on this question, having examined with a great deal of care all the cases cited by counsel for the Commonwealth in support of his objection, but we are unable to reach the conclusion that these citations govern such a case as we have here, where it pertains to an appeal from an appraisal for inheritance tax purposes. The counsel for the Commonwealth has cited as authority in an inheritance tax case Loeffler's Estate, 2 D. & C. 388. In that case objection was made to the testimony of the wife of the decedent, and the objection was sustained by the judge of the orphans' court. An appeal was taken in this case and is reported in 277 Pa. 317, but we do not understand from reading the opinion of the Supreme Court that this question of evidence was determined. It is evident that the court of Lancaster County did not regard the Supreme Court's opinion in the Loeffler Estate case as determining this question of evidence, for about 2 years after the opinion in the Loeffler case the Lancaster County court wrote the opinion in Esbenshade's Estate, 6 D. & C. 520. That case we think very similar to the case before us, and the reasons for the admission of the evidence as competent are clearly expressed.

"It is clear that one whose interest is adverse to the rights of a deceased party is barred from testifying, but this prohibition has no application to this witness. There is no dead party to a thing or contract in action. The Commonwealth's right of action became only after Esbenshade had died, and, therefore, only with an action

between the living have we now to do. From this it follows that the testimony of no witness could have been adverse to the rights of a deceased party. (As a fact, the testimony of the witness was not against, but in favor of the estate. Its effect was to reduce the amount of the tax claimed by the Commonwealth.) In objecting to the competency of this witness, the Commonwealth followed a wrong scent. Because her testimony reflects title to the securities, the Commonwealth concluded that the issue trying is as to title. It goes without saying, if such were the case, the witness would not be competent to testify in her own behalf. But that is not the issue, and if it were, it would not be within the jurisdictional power of this court to try it. The issue before this court is as to the amount of the estate on which tax is collectible; and we know of no rule nor reason justifying an arbitrary grafting of another issue on to it. We do not know to whom these securities belong and do not pretend to say. If there is any uncertainty as to their ownership, that question can be determined in the Court of Common Pleas by the verdict of a jury. They were not found with Esbenshade's papers and securities, and there is circumstantial evidence enough to warrant the conclusion that they would not have been properly there. We decide only that they are not a part of his estate, and, therefore, not subject to the tax."

We think S. J. Watson and Thomas Watson were competent to testify, and their testimony is given consideration as far as material in the matter before the court.

In Frick's Estate, supra, the Supreme Court said:

"It is clear . . . that the tax is to be levied upon 'the clear value' of the entire estate . . . after deducting only 'the debts of the decedent and the expenses of the administration' of such estate. The appraisement to be made is not of the legacies or devises but of the whole estate of a decedent; the debts and expenses of administration are not to be deducted from any particular gift or gifts, but from the whole estate, and the taxes paid to

the United States or to any other state or territory, if permitted to be deducted, would have been from the whole estate. We therefore conclude that it is the entire value of the estate, less the credits specified, which forms the basis of the tax, and not the amounts received by the particular legatees".

The clear value of the estate of the decedent is the difference between the gross value of the assets, after deducting therefrom the debts or obligations of the decedent and the expenses of administration. . . .